# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Phonakone Sangathit (R-43542), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 15 C 10336 |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| Randy Pfister, Warden, Stateville | ) | |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Phonakone Sangathit, a prisoner at Menard Correctional Center proceeding *pro se*, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his 2005 first degree murder conviction and his sentence. Respondent has responded to the petition, and Petitioner has replied. For the reasons explained below, the Court denies the petition, declines to issue a certificate of appealability, and dismisses this case.

## BACKGROUND

On July 31, 2001, Chicago police officers discovered the body of Mario Avila in an alley on Chicago's northside. [24-6] at 210–14. He had been shot once in the chest and once in the head. *Id.* at 252–53. Through further investigation, police learned that Avila dealt drugs and his cellphone had recently called Jorge Rodriguez, also known as Eight Ball, several times. [24-14] at 100–01. On August 5, 2001, after several interviews, Rodriguez told police officers that Petitioner (nicknamed "Poe")

shot Avila. *Id.* at 104. According to a police report, Rodriguez explained to officers that he and Petitioner had planned to steal four kilograms of cocaine from Avila. *Id.* at 105. The morning after Rodriguez's statement, officers arrested Petitioner. [24-6] at 220–21. Petitioner was informed several times of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). [24-6] at 222–24. Petitioner initially agreed to talk to officers and an assistant state's attorney (ASA) and, when asked about Avila's murder, stated that he knew nothing; he then invoked his right to an attorney, ending the interview. [24-5] at 176. Several hours later, at 2:00 p.m., Petitioner knocked on the door of his cell and said he wanted to talk to the ASA. *Id.* at 177. The ASA again read Petitioner his rights, and Petitioner again stated that he understood them. *Id.* at 177. Petitioner then said he did not know why Rodriguez would say that Petitioner shot Avila. *Id.* at 178. Other than asking for food and a cigarette, Petitioner said nothing else at that time. *Id.*

Around 1:00 a.m. on August 8, 2001 (35 hours later), Petitioner again knocked on the door of his cell and told Detective Janet Howard that he (Petitioner) had a problem with his tooth and that the medication for it was at his girlfriend's home. [24-7] at 18–19. Sergeant Wojcik was informed of the request, entered Petitioner's cell, and told him he would receive his medicine. *Id.* at 19. Before Wojcik left the cell, Petitioner asked what was going on with his case and why was he still there. *Id.* at 19–20. Wojcik answered: "You are here because Eight Ball says you shot that guy, and right now the state's attorney is reviewing the case. And they're the ones that are going to determine if any charges are going to be filed." [24-5] at 191–92.

According to Wojcik, as he was again leaving the cell, Petitioner said: "It wasn't me. . . . Eight Ball shot that dude. We were just supposed to take his shit. Nobody was supposed to get shot." *Id.* at 192 (pretrial hearing); [24-7] at 20 (trial). Wojcik testified at a pretrial suppression hearing that he reminded Petitioner, "You were advised of your rights prior to this, right? . . . You understand those rights? . . . You don't have to talk to me about what happened. . . . You understand that those rights apply now?" [24-5] at 192. Petitioner responded "yes." *Id.* Wojcik notified the state's attorney of the conversation, and later that morning charges were filed against Petitioner. *Id.*

Petitioner's attorney filed a motion to suppress the above-described statements because: (1) Petitioner was arrested without a warrant and was not taken before a judge for a probable cause hearing until more than 48 hours after his arrest in violation of *Gerstein v. Pugh*, 420 U.S. 103 (1975); and (2) Petitioner made the statements after requesting counsel and without him reinitiating conversation about the investigation. [24-1] at 30–35. The state trial court held an evidentiary hearing, and Sergeant Wojcik testified about Petitioner's statements and Chicago Detective Demosthenas Balodimas testified about Petitioner's arrest and initial appearance three days after his arrest. [24-5] at 166–204. The trial court determined that Petitioner made his incriminating statements voluntarily and within 48 hours of his arrest and, therefore, denied the motion to suppress. *Id.* at 234–37.

**State Court Trial Proceedings**

At trial, the State presented evidence that Petitioner, Jorge Rodriguez, and Caroline Santos plotted to rob Avila of cocaine and kill him. Santos, who testified pursuant to a plea agreement, stated that on July 30, 2001, she drove her friend Joshua Melendez to pick up Rodriguez on the north side of Chicago. *Id.* at 133–39. In Santos' car, Rodriguez began discussing robbing Avila. *Id.* at 139–40. The plan was that Rodriguez was going to page Avila, set up a purchase of cocaine, and meet Avila at a designated location. *Id.* at 140. Santos, Rodriguez, and Melendez went back to their own residences, changed clothes, and met later that evening. *Id.* at 140–41. Later, Santos and Melendez (with Santos again driving) picked up Rodriguez and then Petitioner. *Id.* at 141–44. Petitioner sat in the back seat on the passenger side. *Id.* at 145. As she drove, Santos saw Petitioner doing something with a gun. *Id.*

Santos further testified that, as she, Melendez, Rodriguez, and Petitioner drove around looking for and setting up "a dark spot" to meet Avila, they discussed their plans. [24-6] at 148–54. They considered simply beating Avila up, but Rodriguez, who sold drugs for Avila, said Avila would come back for them and that "they were going to have to kill him." *Id.* at 154–55. Petitioner agreed and volunteered to do the shooting. *Id.* Per the plan, Petitioner, who did not know Avila, would pretend to be the buyer; Rodriguez would introduce Petitioner to Avila; Petitioner and Rodriguez would take the cocaine; and Petitioner would shoot Avila. *Id.* at 155–56. As they neared the meeting location, Rodriguez spotted Avila's car

and told Santos to park a short distance away. *Id.* at 156–57. Rodriguez and Petitioner then exited the car. *Id.* at 157.

Petitioner, alone, returned to Santos' car a short time later and got in the passenger seat. [24-6] at 159. Santos asked Petitioner about Rodriguez, and Petitioner responded that Rodriguez "freaked and . . . ran home." *Id.* As they drove away, Santos noticed Petitioner wiping his hands on his pants, and she gave him a bottle of water to wash his hands. *Id.* at 159–60. Petitioner told Santos and Melendez that: Rodriguez introduced Avila to Petitioner; Petitioner asked Avila if he had "the stuff," while Avila asked Petitioner if he had the money; both replied yes; Petitioner then walked to Rodriguez and told him that Avila had the cocaine but that it was not very good. *Id.* at 161. Petitioner then said that "he (Petitioner) just turned around and shot him." *Id.* at 162. Petitioner stated to Santos that he shot Avila in the chest and the head. *Id.* Petitioner said he took Avila's keys and tossed them to Rodriguez, who opened the trunk to get the cocaine, but Rodriguez said there was nothing there. *Id.* at 162–63.

According to Santos' testimony, she picked up Rodriguez several days later and he had a box with him; Santos assumed there was a gun in the box. *Id.* at 165–66. She drove Rodriguez to the home of David Duran; Rodriguez left the car and returned with $200 and a $10 "bag of weed." *Id.* at 167–68.

Petitioner's trial attorney cross-examined Santos at trial and focused upon her deal with prosecutors to plead guilty in exchange for her testimony. *Id.* at 173–75. She stated that she was facing 20 to 40 years of imprisonment and, for testifying

against Petitioner, the State would recommend that she receive 14 years of imprisonment. *Id.* at 133, 174–75.

Evelyn Rodriguez (hereinafter Evelyn), Jorge Rodriguez's sister, testified before a grand jury in 2001 and at Petitioner's trial in 2005. At trial, Evelyn claimed that she remembered nothing from July 30, 2001 about her brother's and Petitioner's actions. [24-6] at 44–47. The prosecutor then introduced her grand jury testimony. *Id.* at 47–48.

Before the grand jury, Evelyn testified that she was home on July 29, 2001 with her cousin Lorena Reynoso (Petitioner's girlfriend). Reynosa spent the night. *Id.* at 49. Evelyn stated that Petitioner came to her house on the morning of July 30th; that he had a gun; and that he wrapped it in one of Evelyn's t-shirts. *Id.* at 50–52. She further stated that later in the day, when she was at Reynosa's house to shower (hers was being fixed), she overheard Petitioner tell three of his friends that "he did a mission for nothing. That he was supposed to get a brick." *Id.* at 64. According to Evelyn's grand jury testimony, Petitioner told his friends that "he popped that dude . . . two times. In the head and in the chest. . . . [and] left the guy by Irving Park and Laramie." *Id.* at 65–66. Evelyn understood "brick" to mean drugs and "pop" to mean shoot. *Id.*

At Petitioner's trial, Evelyn claimed that, when she testified before the grand jury, she was 15 years old and scared because detectives threatened that "[she] could go down for this case," and that she was told what to say. [24-6] at 52, 62–63. Following Evelyn's trial testimony, the assistant state's attorney who called her to

testify before the grand jury and Officer Balodimas, who interviewed her in 2001, both testified that they never threatened her or told her what to say. *Id.* at 109–10, 230–31. Balodimas further testified that he never told Evelyn that Avila's body was found near Irving Park and Laramie or that Avila had been shot twice. *Id.* at 232.

Balodimas also testified that Jorge Rodriguez, who had cooperated with officers, took Balodimas to David Duran's house, where he found a .38 caliber revolver, which was loaded with four rounds and had two empty chambers. [24-6] at 217–19. The parties stipulated that a ballistics expert determined that Avila likely was shot with a .38 caliber revolver but could not determine if the bullet fragment from Avila's body came from the gun retrieved from Duran's house. [24-7] at 13.

During closing argument, the prosecutor noted that Petitioner admitted to Santos that he shot Avila and later admitted the same in front of Evelyn Rodriguez, but days later told Sergeant Wojcik that Eight Ball shot Avila while Petitioner and Eight Ball were robbing him. [24-7] at 44. The prosecutor said, "It doesn't matter. They still share in responsibility, because [Petitioner] did not know then what you know now, about the law of legal responsibility, of accountability. It doesn't matter whether he didn't shoot or did shoot." *Id.* During deliberations, the jury sent a note stating:

> We think we understand the law that was stated to us, but please make it clearer to us that if Poe was part of a conspiracy to commit a crime, and the victim died, is Poe guilty of first-degree murder.

[24-7] at 118. The trial judge, after consulting attorneys for both sides, responded to the jury: "[P]lease closely reread the instruction beginning 'to sustain the charge of

first-degree murder' and determine if that answers your question." *Id.* at 120. The

jury then returned a verdict of guilty on the first-degree murder charge. *Id.* at 122.

At sentencing, after hearing arguments from the attorneys, the trial judge

asked Petitioner if he wanted to say something before sentence was imposed.

Petitioner responded:

> I want to know if I can put in a motion for ineffective counsel and due to
> the fact that, you know, I have witnesses that I wanted to put on the
> stand and I feel like Mr. Solano ain't did what he was supposed to do for
> me.

[24-7] at 151. The trial judge asked Petitioner's attorney if he knew what Petitioner

was referring to, and his attorney responded that they had discussed whether

Petitioner should testify, ultimately deciding that he should not, because the trial

judge previously excluded testimony from Rodriguez, who had been found guilty after

a trial before the same judge. *Id.* at 152–53. The attorney knew of no other witnesses.

*Id.* at 153. The trial judge then sentenced Petitioner to 35 years on the first-degree

murder charge, plus an additional 15 years for being armed with a firearm during

the offense. *Id.* at 153–54.

**State Direct Appellate Proceedings**

Petitioner filed a direct appeal, arguing that: (1) the prosecutor impermissibly

told jurors to send a message about society's violence during closing argument; (2) the

trial court should have more thoroughly addressed Petitioner's assertions of

ineffective assistance of counsel; (3) Evelyn's grand jury testimony should not have

been allowed at trial; and (4) Petitioner should receive additional sentencing credit

for time served. [24-9]. The state appellate court affirmed the conviction but ordered

that Petitioner receive credit for an additional two days. [24-12] at 18–34. Petitioner filed a petition for leave to appeal (PLA) asserting the first three arguments described above and included them in his direct appeal. [24-12]. The Illinois Supreme Court denied the PLA. [24-13].

## State Post-Conviction Proceedings

Petitioner filed a petition for post-conviction relief in state court, arguing that: (1) the trial court should order additional ballistics testing since Petitioner's attorney did not seek a separate examination of the gun and stipulated to the State's ballistics expert's findings; (2) Petitioner's trial and appellate attorneys were ineffective in various respects; (3) officers lacked probable cause for his arrest and failed to provide him with a probable cause hearing within 48 hours of the arrest; (4) his statement violated his rights under *Miranda*; (5) the evidence was insufficient to support a guilty verdict; and (6) the trial court's jury instructions confused the jury and the trial court did not adequately clarify the instructions. [24-14] at 73–119.

The trial court appointed counsel for Petitioner, and counsel filed two supplemental post-conviction petitions, asserting additional claims and stating that Petitioner was now claiming ineffective assistance of counsel based upon trial counsel's failure to explain the penalties Petitioner faced when informing him of plea offers from the State. [24-14] at 124–30, 218–30. The trial court, ruling from the bench, denied all but one of Petitioner's claims and ordered an evidentiary hearing to address whether trial counsel sufficiently explained the State's plea offers to Petitioner. [24-15] at 37–43.

At the evidentiary hearing, Petitioner's trial attorney, Vince Solano, testified that the State made three plea offers and he explained each to Petitioner. According to Solano: (1) before trial, while the parties were litigating the admissibility of Petitioner's incriminating statement, Solano told Petitioner that the State offered 30 years' imprisonment, which he explained was below the minimum of 35 years; (2) after a jury was selected and one or two witnesses had testified, the State offered 20 years' imprisonment, which Solano conveyed to Petitioner and "begged him to take"; and (3) after trial concluded, while the jury was deliberating, the State again made an offer, which Solano explained to Petitioner, but which Petitioner rejected. [24-15] at 93–121. The prosecutor who made the offers also testified at the hearing, *id.* at 121–28, and based upon the consistent testimony of both attorneys, the trial court found that Solano had adequately explained the plea offers; the trial court, accordingly, denied this remaining postconviction claim as well. *Id.* at 165–66.

On appeal, Petitioner's counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). [24-17] at 40–54. Petitioner responded, arguing that: (1) he was actually innocent and needed additional ballistics testing; (2) his trial counsel was ineffective; (3) his appellate counsel was ineffective; (4) his arrest was illegal; (5) his detention violated *Gerstein* because he did not get a probable cause hearing within 48 hours of his warrantless arrest; (6) officers violated his *Miranda* rights with respect to his incriminating statement to Sergeant Wojcik; (7) his conviction was not supported by sufficient evidence; and (8) the jury instructions confused the jury. *Id.* at 56–74. The state appellate court summarily affirmed,

stating, "We have carefully examined the record in this case, counsel's memorandum, and defendant's response, and have found no issues of arguable merit on appeal." *Id.* at 76. Petitioner filed a PLA in the Illinois Supreme Court, repeating these same claims, and the Illinois Supreme Court denied it. [24-17]; [24-18].

## **Petitioner's Habeas Corpus Petition**

Petitioner then filed the present petition for writ of habeas corpus under 28 U.S.C. § 2254, [1], asserting the following claims:

(1) the prosecutor committed misconduct during closing arguments when he told the jury it should "do something about this violence" and when he stated, falsely, that the Petitioner shot the victim "at close range," *id.* at 12–14;

(2) the trial court should have investigated the assertions Petitioner made at his sentencing concerning ineffective assistance of counsel, *id.* at 14–16;

(3) the trial court improperly admitted Evelyn Rodriguez's grand jury testimony, which she gave when she was only 15 years old, *id.* at 16–20, 130–31;

(4) Petitioner should be allowed to conduct further ballistics, DNA, and fingerprint testing under 725 ILCS 5/116-3 to demonstrate his innocence, *id.* at 108–12;

(5) Petitioner's Fourth Amendment rights were violated when: (a) officers arrested him without probable cause (more specifically, he claims that officers should not have relied on Jorge Rodriguez' statement that he and Petitioner killed Avila); (b) officers entered Reynosa's apartment without a warrant or exigent circumstances and unnecessarily struck Petitioner on the head; (c) officers failed to provide him with a probable cause hearing within 48 hours of his arrest, *id.* at 119–24;

(6) Petitioner's inculpatory statement—that Rodriguez shot Avila and Petitioner and Rodriguez intended only to rob him—was inadmissible because: (a) it was fruit of the illegal arrest, and (b) he said

it after invoking his right to an attorney, and it was coerced, *id.* at 125–27;

(7)  the jury's verdict was not supported by substantial evidence (more specifically, Santos' testimony was unreliable because she testified only to get a plea deal; there was no eye-witness testimony, and no sworn statements or videotaped confession from Petitioner; there was no physical evidence connecting Petitioner to the crime scene or weapon; and the gun introduced into evidence as the murder weapon was different than the gun Santos described), *id.* at 128–29, 131–32;

(8)  the trial court improperly instructed the jury on accountability given that the only evidence supporting the instruction was Petitioner's statement that he and Rodriguez intended to rob Avila and Rodriguez shot him, *id.* at 134–36;

(9)  Petitioner's trial attorney was ineffective for: (a) failing to object to the prosecutor's impermissible closing arguments, *id.* at 12–13; (b) failing to call Reynosa family members to testify about officers entering their house on August 6, 2001, without a warrant, without permission, and without knocking, *id.* at 113–14; (c) failing to object to the introduction of the gun, and stipulating to the ballistics expert's testimony about it, *id.* at 114–15; (d) failing to better challenge Petitioner's incriminating statement—that he and Rodriguez intended only to rob Avila and Rodriguez shot him—by calling Detective Janet Howard and other witnesses to contradict Sergeant Wojcik's testimony that Petitioner knocked on his cell door to request medication for his tooth and then reinitiated conversation about his case, *id.* at 114–15; (e) failing to object to admission of Evelyn Rodriguez's grand jury testimony at trial, *id.* at 116; (f) failing to object to the trial court's response to the jury's question during deliberation about the accountability instruction, *id.*; (g) failing to move to dismiss the indictment when it issued more than 30 days after Petitioner's arrest, *id.*; (h) failing to inform Petitioner about the 15-year enhancement to his sentence based on the use of a gun during the offense, *id.*;

(10)  Petitioner's appellate attorney on direct appeal was ineffective for failing to challenge the use of Petitioner's inculpatory statement and the sufficiency of the evidence, *id.* at 117–18.

# DISCUSSION

## A.    Applicable Legal Standards

Before delving into Petitioner's claims, the Court notes the relevant standards of review.  First, a person in custody pursuant to a state-court conviction may petition for a writ of federal habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas corpus relief "does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Indeed, federal habeas relief only becomes available if the state-law error deprives the claimant of a federal constitutional right, such as his "Fourteenth Amendment due process right" to a fundamentally fair trial. *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

Second, a federal court cannot grant federal habeas relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  This requires the § 2254 petitioner to "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings."  *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  Failure to properly exhaust results in a claim being procedurally defaulted, meaning a federal habeas court cannot review it "unless the petitioner can demonstrate both cause for and prejudice stemming from that default," or "that the denial of relief will result in a miscarriage of justice." *Lewis*, 390 F.3d at 1026 (citations omitted).

Third, for claims presented to and denied by a state court, federal habeas relief is available only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This deferential standard of review "applies even where there has been a summary denial" and the state court does not explain its reasons. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011); *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (the absence of an indication of a procedural ground for the dismissal of a claim allows a presumption that the state court "adjudicated the claim on the merits"); *Maury v. Pfister*, No. 17 C 00486, 2017 WL 5891197, at *9 (N.D. Ill. 2017) (§ 2254(d) applied to state appellate court's summary dismissal and grant of appellate counsel's *Finley* motion to withdraw).

With these standards in mind, the Court turns to Petitioner's claims.

**B.     Claim One: Prosecutorial Misconduct During Closing Argument**

Petitioner first argues the prosecutor: (a) improperly told the jury during closing argument to send a message about society's violence; and (b) incorrectly stated that Avila was shot at close range. [1] at 12. At the end of his closing argument, the prosecutor stated:

> When you consider the statements that [Petitioner] made in light of all the evidence, when you consider all the evidence that you have heard today and apply the law to that evidence, you will reach one verdict. It is often said, whether you are with your family, dinner, your friends, . . . . Why doesn't someone do something about this violence? I submit to you today, that you are that somebody. And the next time someone says why

14

doesn't somebody do something about this violence, you can look at them in the eye and say I did. I told Phonakone Sangathit you can run but you can't hide. I told the Defendant you can't escape responsibility for the things that you do. Tell him, members of the jury. Tell him with your verdict of guilty.

[24-7] at 57–58.

The state appellate court on direct review determined that: (1) Petitioner neither objected to the prosecutor's comments at trial nor raised the issue in a motion for new trial; (2) under plain error review, the claim warranted no relief; and (3) even if properly raised, the claim lacked merit because the prosecutor's comment was not pervasive and did not encourage the jury to convict based on emotion, rather than the evidence. [24-12] at 21–23.

Because the state court relied upon a state procedural bar and reviewed the claim for plain error, the claim is procedurally defaulted here even though the state court addressed the merits in the alternative. *See, e.g.*, *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) ("[i]f a state court clearly and expressly states that its judgment rests on a state procedural bar and does not reach the merits of a federal claim, then we are unable to consider that claim on collateral review" and review of a "claim for plain error as the result of a state procedural bar . . . does not constitute a decision on the merits"); *see also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (even if the state court "reach[es] the merits of a federal claim in an *alternative* holding," the procedural bar applies) (emphasis in original). Petitioner demonstrates neither cause for the default and actual prejudice nor a fundamental miscarriage of justice to allow review of the claim. *Gray*, 598 F.3d at 330. Though he argues his attorney was

ineffective for failing to object to the prosecutor's closing remarks, "[t]o establish actual prejudice," he must show "not merely that the errors at [his] trial created a possibility of prejudice, but that they worked to [his] actual and substantial disadvantage, infecting [his] entire trial with error of constitutional dimensions." *Farmer v. United States*, 867 F.3d 837, 842 (7th Cir. 2017). Petitioner has not made such a showing. Nor has he demonstrated actual innocence, such that the Court could invoke the fundamental miscarriage of justice exception to the default. *House v. Bell*, 547 U.S. 518, 538 (2006). Federal habeas review remains thus procedurally barred for this meritless claim.

Beyond the procedural default, the Court notes that the prosecutor's closing remarks did not amount to a constitutional violation. As recognized by the state appellate court, the prosecutor's disputed comments—about the jury doing something about society's violence—were limited and prefaced by his directive for the jury to consider the evidence. [24-7] at 44–58. Additionally, Petitioner fails to show any error in the prosecutor's comments to the degree they properly asked the jury to send a message to the Petitioner himself by holding him responsible for own actions under the law. As such, Petitioner cannot demonstrate that the prosecutor's comments so infected his trial to render it constitutionally unfair. *See Baer v. Neal*, 879 F.3d 769, 788 (7th Cir. 2018) (when addressing a constitutional claim of prosecutorial misconduct, courts must consider the "conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant . . . as to deprive him of a fair trial'") (citations omitted). This claim

is without merit, and the state appellate court's denial of it was reasonable under § 2254(d).

Nor does the prosecutor's closing comment on rebuttal that Petitioner shot "at close range" warrant § 2254 relief. Invited by defense attorney's closing remarks that there was no evidence of blood splatter on Petitioner's clothes, [24-7] at 66, the prosecutor in response told the jury "the shots were, at close range, they are outside the car, boom, boom, boom," *id.* at 91. As noted by the state appellate court, this statement remained consistent with the medical examiner's stipulated testimony. While the examiner's stipulated testimony indicated that there was "no evidence of close-range firing," the parties also agreed that this meant "the firearm was fired from a distance of 18 inches or more." [24-6] at 252. The state appellate court noted that the prosecutor never stated "that the shots were fired in any closer proximity than outside the car," [24-12] at 25, and obviously, such a determination of the facts is not unreasonable "in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(2). The Court denies claim one.

## C. Claim Two: The Trial Court's Failure to Address the Ineffective Assistance of Counsel Statement Petitioner Made at Sentencing

At sentencing hearing, the trial court asked Petitioner if he had anything to say before sentence was imposed. Petitioner replied that his attorney had been ineffective for not calling witnesses. [24-7] at 151. The trial court asked Petitioner's attorney to address Petitioner's allegation but did not appoint an independent attorney to further investigate the claim. *Id.* at 152–53. Counsel advised the trial court that he discussed the trial witness list with Petitioner, that they discussed

whether Petitioner should testify, but that he did not know of any other witnesses who could have testified for Petitioner. [24-12] at 26–31. Satisfied with counsel's response, the trial court proceeded with sentencing. [24-7] at 153.

On direct appeal, Petitioner argued that, pursuant to *Illinois v. Krankel*, 464 N.E.2d 1045 (Ill. 1984), the trial court should have appointed a new attorney to investigate. The appellate court determined that the trial court adequately addressed Petitioner's contentions at the sentencing hearing and that Petitioner never rebutted the attorney's explanation of the matter (indeed, even here, Petitioner does not say who he thinks his attorney should have called). The state appellate court concluded that there had been no *Krankel* violation. [24-12] at 26–31.

Petitioner's claim that the trial court should have done more under *Krankel* does not constitute a federal constitutional claim. *Hall v. Lashbrook*, No. 14-CV-02687, 2018 WL 6830326, at *5 (N.D. Ill. Dec. 28, 2018) (*Krankel* violation is a state "common law procedure developed by the Illinois Supreme Court.") (citing *Illinois v. Ayres*, 88 N.E.3d 732, 734 (Ill. 2017)). Consequently, a petitioner is "not entitled to habeas corpus relief on a *Krankel* claim because it raises a non-cognizable issue of state law." *Hall*, 2018 WL 6830326, at *5. Federal habeas review of state law claims remains unavailable unless state errors "infect" a trial to the point where they violate the defendant's constitutional rights. *Perruquet*, 390 F.3d at 511. Petitioner does not explain the basis for his claim; nor does he explain how the purported error violated his Fourteenth Amendment right to a fair trial. Indeed, based upon the record, the trial addressed the matter properly. As a result, the Court denies claim two.

## D.    Claim Three: Evelyn Rodriguez's Grand Jury Testimony

At Petitioner's trial, Evelyn testified that she did not remember the events in July of 2001.  [24-6] at 47.  The prosecutor then introduced Evelyn's grand jury testimony from August of 2001.  In her sworn testimony, she stated that Petitioner's girlfriend was at Evelyn's house on the morning of July 30, 2001, and Petitioner came there to see her; at that time, he had a gun wrapped in a t-shirt.  *Id.* at 51.  She further testified that, later that same day, she was at Petitioner's girlfriend's house showering, and, after coming out of the shower, she overheard Petitioner tell his friends that: "he shot a dude, two times. In the head and in the chest," and "did a mission for nothing" because he was "supposed to get a brick . . . drugs."  *Id.* at 63–65.  At Petitioner's trial, Evelyn claimed that her grand jury testimony was false and that she just told the grand jury what the detectives told her to say; she was just 15 or 16 years old at the time, and she was scared because the detectives told her she could be charged if she did not cooperate.  [24-6] at 52, 62–63, 66–67.  Petitioner argues that the trial court erred when it allowed Evelyn's grand jury testimony into evidence without an inquiry into its voluntariness.  [1] at 16.

On direct appeal, the state appellate court determined that the trial court properly admitted Evelyn's grand jury testimony under Illinois law, 725 ILCS 5/115.10[1]; neither Illinois law nor federal law required a voluntariness determination as to the prior inconsistent statement; and, even though the trial court did not need

---

[1] Under 725 ILCS 5/115-10.1, a trial witness's prior statement is admissible if: "(a) the statement is inconsistent with h[er] testimony at the hearing or trial, . . . (b) the witness is subject to cross-examination concerning the statement, and (c) the statement . . . was made under oath at a trial, hearing, or other proceeding."

to address the voluntariness and reliability of Evelyn's grand jury testimony, both were established at trial when Detective Balodimas and Assistant State's Attorney Thomas Driscoll testified about Evelyn voluntarily giving her testimony in 2001. [24-12] at 31–33. This determination was neither "contrary to" clearly established Federal law, as determined by the Supreme Court, nor the product of "an unreasonable application of" such law; nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

Although a defendant's coerced statement cannot be introduced against him at trial, *see Jackson v. Denno*, 378 U.S. 368, 385–86 (1964), the Supreme Court has not yet "decided whether the admission of a coerced third-party statement is unconstitutional," *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008); *see also Arias v. Warden, Centinela State Prison*, No. CV 18-5714-AG(E), 2019 WL 1075275, at *7 (C.D. Cal. Jan. 25, 2019); *Williams v. Campbell*, No. 2:15-CV-12914, 2016 WL 6873391, at *10 (E.D. Mich. Nov. 22, 2016) (both cases collecting other cases). Thus, even if Petitioner could establish that Evelyn's testimony was coerced (which he has not), the outcome here would be the same: allowing a nondefendant's coerced statements is not unconstitutional. *Samuel*, 525 F.3d at 569. Only if "the coercive police misconduct at issue" was so "egregious such that it produces statements that are unreliable as a matter of law," might the coerced statements be inadmissible. *Id.* at 571 (quoting *State v. Samuel*, 643 N.W.2d 423, 426 (Wis. 2002)). That is not the

case here, as the record demonstrates neither egregious police conduct nor unreliability as to Evelyn's grand jury testimony.

At trial, ASA Driscoll, who represented the state before the grand jury, testified that he did not tell Evelyn what to say; on the contrary, he testified that she provided details she could not otherwise have known–that Petitioner wrapped the gun in one of Evelyn's t-shirts; that Evelyn heard Petitioner's statements at Petitioner's girlfriend's house, where she had gone to shower because her bathroom was being fixed; and that the victim had been shot in the head and chest. [24-6] at 100–14. Additionally, he testified that Evelyn, when asked, told the grand jury under oath she had not been threatened and had not asked for her parents to be present. *Id.* Detective Balodimas similarly testified that when Evelyn came to the police station he spoke to her but never threatened her or told her she could be charged with a crime; he testified he provided her no details of the murder and did not tell her how many times (or where) Avila was shot; nor did he tell her what to say before the grand jury. *Id.* at 230–33.

The Illinois appellate court found that Detective Balodimas' and ASA Driscoll's testimony "demonstrates the voluntariness of the grand jury statement made by Evelyn Rodriguez," [24-12] at 33, and this Court concurs and thus cannot say that finding was "an unreasonable determination of the facts in light of the evidence presented" at trial, *see* 28 U.S.C. § 2254(d)(2). On this record, this Court cannot find that Evelyn's grand jury testimony was involuntary or that Balodimas' and Driscoll's conduct was "egregious" such that it produced statements that are "unreliable as a

matter of law." *Samuel*, 525 F.3d at 571. For these reasons, the admission of Evelyn's grand jury testimony at Petitioner's trial did not violate his constitutional rights. *See id.*; *Arias*, 2019 WL 1075275, at *7; *Williams*, 2016 WL 6873391, at *10. Furthermore, at trial, Petitioner's attorney cross-examined Evelyn extensively about her grand jury testimony, [24-6] at 75–84, which would further undermine any constitutional claim, *see Nasrichampang v. Woodford*, 288 F. App'x 367, 368 (9th Cir. 2008) ("There is no violation of due process when a witness who previously was illegally interrogated is 'subject to cross-examination at trial through which the jury could assess the witness's credibility.'") (citation omitted). Claim three is denied.

E.     **Claim Four: Additional Ballistics Testing**

Petitioner next argues that the state trial court in his post-conviction proceedings erred when it denied his motion to conduct further ballistics testing pursuant to 725 ILCS 5/116-3. [1] at 108–12. Here, Petitioner argues that, in addition to the ballistics testing, he should also be able to get "fingerprints and touch DNA on the gun." *Id.* at 111.

Petitioner's claim for additional testing under § 5/116-3 raises a state law issue, not a federal issue. There is "no freestanding constitutional right to post-conviction DNA (or other forensic) testing." *Moore v. Hardy*, No. 12 C 8325, 2013 WL 1816253, at *18 (N.D. Ill. Apr. 29, 2013) (citing *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-73 (2009)). Nor does Petitioner have a substantive due process right to attempt to prove his innocence in this way. *See*

*Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also McDowell v. Alvarez*, No. 09 C 8033, 2012 WL 3481642, at *9 (N.D. Ill. Aug. 15, 2012).

Although the applicability of § 5/116-3 is a matter of state law, the Supreme Court has also recognized that, where a state enacts laws allowing a convicted person to prove his innocence, the convicted person has a "liberty interest in demonstrating his innocence with new evidence under state law." *Osborne*, 557 U.S. at 68; *see also McDowell*, 2012 WL 3481642, at *9. Once a state creates a liberty interest, it cannot deprive a person of that interest absent due process. *Id.* But "a State's postconviction relief procedures" violate procedural due process rights "only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. The procedures must offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or transgress a "recognized principle of fundamental fairness in operation." *Id.* (internal quotation marks and citation omitted).

In state court, Petitioner failed to challenge the constitutionality of Illinois' procedures with respect to § 5/116-3, and thus he did not exhaust such a claim. *See* § 2254(b). Nor does he argue now that Illinois' procedures contain any constitutional flaw. Rather, he claims merely that he is actually innocent (without any factual basis) and that additional ballistics (and possibly DNA and fingerprint) testing would purportedly assist him in proving as much. [1] at 108–12. He thus asks this Court to determine not the constitutionality of any state court procedure, but the

correctness of the state court's decision to deny additional testing under the Illinois statute. That claim is not cognizable here.

Having said this, the Court further finds that Petitioner's requests for additional testing under § 5/116-3 lack any material basis. The stipulated testimony from the ballistics expert at Petitioner's trial remained inconclusive as to whether the gun introduced at trial was the specific gun used to shoot Avila. [25] at 31; [24-7] at 13. Petitioner thus appears to want testing to disprove something that was never proven at trial. Likewise, even if DNA or latent fingerprint testing were performed, the mere absence of a positive match could not establish his actual innocence based on the record here. Claim four is denied.

## F. <u>Claim Five: Petitioner's Fourth Amendment Claims</u>

Petitioner next claims his Fourth Amendment rights were violated because: (1) officers lacked probable cause to arrest him; (2) officers impermissibly entered his girlfriend's residence without a warrant or exigent circumstances; and (3) officers failed to provide him with a probable cause hearing within 48 hours of his arrest, as required under *Gerstein*, 420 U.S. at 126. [1] at 119–24. Petitioner contends that the incriminating statement he made—that he thought he and Rodriguez were just going to steal Avila's drugs and that Rodriguez shot him—was a product of his illegal arrest. *Id.* at 125.[2]

This Court, on habeas review, may not address the merits of Fourth Amendment claims if the State has "provided an opportunity for full and fair

---

[2] Respondent contends Petitioner's Fourth Amendment claims are procedurally defaulted because Petitioner raised them only as part of his ineffective assistance of counsel claims. [25] at 22–23. A fair

litigation of" those claims. *Stone v. Powell*, 428 U.S. 465, 481-82 (1976). Fourth Amendment violations are "different in kind from denials of Fifth or Sixth Amendment rights in that claims of illegal search and seizure do not impugn the integrity of the fact-finding process or challenge evidence as inherently unreliable." *Id.* at 479 (internal quotations and citation omitted). Rather, the "exclusion of illegally seized evidence is simply a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers." *Id.* For a federal habeas petitioner to obtain relief on a Fourth Amendment claim, he must show two things: (1) that the state court "denied him a full and fair hearing" on his claim; and (2) that the "claim was meritorious." *Monroe v. Davis*, 712 F.3d 1106, 1112–13 (7th Cir. 2013) (citing *Wallace v. Kato*, 549 U.S. 384, 395 n.5 (2007) (collecting cases)).

In Petitioner's case, his attorney initially filed a motion seeking to quash his arrest for lack of probable cause and to suppress any evidence obtained after the arrest. [24-2] at 70–72. Later, the attorney withdrew the motion and filed an amended one, arguing that Petitioner's statement should be suppressed because he was not brought before a judge for a probable cause hearing within 48 hours of his warrantless arrest pursuant to *Gerstein* and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and that Petitioner invoked his right to counsel before giving the statement and did not reinitiate conversation about his case. [24-5] at 32–35, 165. The trial court held an evidentiary hearing and heard from Detective Balodimas (who arrested Petitioner) and Sergeant Wojcik (who took Petitioner's statement). [24-5] at

reading of Petitioner's state post-conviction petition, however, shows that he raised these claims independently and as part of his ineffective assistance of counsel claims. [24-14] at 80–81.

166–204. Based upon this evidence, the trial court found that Petitioner's statement "occurred well before the 48-hour period" ended and that he reinitiated conversation about the investigation. *Id.* at 235.

In short, Petitioner had a full and fair hearing on his *Gerstein/McLauglin* claim, and "absent a subversion of the hearing process," this Court may not examine whether the state court "made the right decision." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008)). Petitioner does not argue that the hearing process was subverted and, even if he had done so, the record fails to show any merit to his claim. Therefore, further consideration of this claim remains barred by *Stone*.

Petitioner's claim that the statement stemmed from his illegal arrest without probable cause also is barred. *Stone*'s bar to federal habeas review applies if a petitioner had the *ability* to litigate the claim, even if a petitioner does not actually litigate it. A "petitioner is not denied an opportunity for full and fair litigation of his claim if he fails to raise and to preserve the claim in state court." *U.S. ex rel. Bostick v. Peters*, 3 F.3d 1023, 1027 (7th Cir. 1993). There is "no question that Illinois' mechanism for the resolution of Fourth Amendment claims does afford, in the abstract, defendants the opportunity to raise their Fourth Amendment claims." *Id.* at 1027. Petitioner could have raised in state court his claim that his statement followed an illegal arrest. He did not.

Federal habeas review of Petitioner's Fourth Amendment claims is thus barred by *Stone*, 428 U.S. at 481–82. Even though no merits review is needed under *Stone*, the record nevertheless confirms that probable cause for Petitioner's arrest clearly

existed, as explained below, in connection with Petitioner's ineffective assistance of counsel claim. Claim five is denied.

## G.    Claim Six: Petitioner's Statement and *Miranda*

In addition to claiming that his incriminating statement resulted from an illegal arrest and a *Gerstein* violation, Petitioner also asserts a Fifth Amendment claim, arguing that the police procured his statement in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Petitioner alleges that, when he made the statement, he had already requested an attorney, he had been hit on the head during his arrest, and he had been locked in a room for almost two days. [1] at 125–27.

Under well-settled law, an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Accordingly, the trial court held an evidentiary hearing on Petitioner's motion to suppress the statement and, based upon the evidence, determined that:

> Sangathit . . . had invoked his rights on a number of occasions, so there is no question . . . he knew his rights and was of sufficient mental capacity to invoke those rights, either to remain silent or the fact that he may have wanted an attorney before any questioning. That's shown in the record a number of times. . . . Looking at . . . how the statement was given, I don't believe the statement, the last statement that was made by Defendant, was the result of police initiating contact with the Defendant, rather the opposite. . . . but for his asking for the medication and then Sergeant Wojcik attempting to comply . . . this statement maybe never would have happened. [The] fact that he made the statement . . . I don't believe was done in violation of *Miranda*.

[24-5] at 235–36.  This Court presumes these findings are correct, *see* 28 U.S.C. § 2254(e)(1), and Petitioner has offered nothing to rebut the presumption.  Without question, his assertion here that he did not reinitiate the conversation falls far short of the "clear and convincing evidence" necessary to rebut the presumption.  *Id.*  Based upon this record, the Court concurs with the state trial court findings, and cannot otherwise say the denial of Petitioner's *Miranda* claim was unreasonable.  Claim six is denied.

## H.    Claim Seven: Sufficiency of the Evidence

Petitioner next claims that the evidence adduced at trial remained insufficient to support the jury's guilty verdict.  Petitioner argues that the "principle evidence" came from Caroline Santos, "a witness whose motivation was to get a plea deal"; he argues the prosecution presented no signed statement or videotaped confession, no eyewitness testimony, and no DNA or fingerprint evidence, and the gun admitted into evidence "did not match crime scene ballistics" and was "not the same gun described by Santos, who claimed she saw a gun with a white handle."  [1] at 128–29.

The law provides a "rigorous" standard for proving the insufficiency of the trial evidence underlying a conviction: the "evidence, viewed in the light most favorable to the State, is sufficient to support a conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt."  *Jones v. Butler*, 778 F.3d 575, 581 (7th Cir. 2015) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Petitioner cannot meet this demanding standard.

In making this claim, Petitioner emphasizes the kind of evidence he thinks should have been admitted at trial, but was not. Focusing on the evidence that was presented, however, it is easy to find support for the jury's verdict. The jury heard from Caroline Santos, who testified that she, Rodriguez, and another person plotted to steal cocaine from Avila; that Rodriguez called Avila and told him he had a buyer looking for cocaine; that she and Rodriguez picked up Petitioner, who was going to pretend to be the buyer; that Petitioner and Rodriguez initially discussed just beating up Avila, but then decided that they were going to have to kill him; that Petitioner said he would shoot Avila; that she drove to the designated meeting place and parked nearby; that Petitioner and Rodriguez exited the car and, later, only Petitioner returned; and that Petitioner told her he shot Avila in the chest and head, while wiping his hands on his pants. [24-6] at 150–56, 160–62. The jury also heard from Evelyn Rodriguez, who testified that, the day after the shooting, she heard Petitioner say that he had shot someone twice—once in the chest and once in the head. [24-6] at 65–66. And the jury also heard that, several days after the shooting, Petitioner told police he and Jorge Rodriguez planned to rob Avila and steal his cocaine, but then Rodriguez shot Avila. [24-7] at 20.

A jury can convict without a signed confession or direct physical evidence linking a defendant to the crime scene; "there is nothing wrong with circumstantial evidence of guilt." *United States v. Memar*, 906 F.3d 652, 656 (7th Cir. 2018). Three witnesses testified that Petitioner, on three separate occasions, confessed to either shooting Avila or participating in robbing Avila while his coconspirator purportedly

shot him. In two of those incriminating statements, Petitioner stated that he shot Avila in the head and in the chest, which remains consistent with Avila's gunshot wounds. Although Petitioner argues that Santos lacked credibility because she testified pursuant to a plea bargain, and that Evelyn's grand jury testimony lacked credibility because she was young and scared and allegedly pressured to say those things, counsel explored those circumstances on cross examination and the jury made its own assessment of the witnesses' credibility first hand. This Court may not "reweigh the evidence" or re-assess "the credibility of witnesses." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017). In short, the evidence presented to the jury supports the guilty verdict. *E.g., United States v. Singh*, 483 F.3d 489, 495 (7th Cir. 2007) (trial evidence sufficed where defendant's confession of how victim was killed correlated with details from victim's autopsy). The state courts' denial of this claim was not unreasonable, *see* 28 U.S.C. § 2254(d), and, as a result, claim seven is denied.

## I. Claim Eight: The Decision to Instruct the Jury on Accountability

Petitioner next claims the evidence failed to support the trial court's decision to give an accountability instruction.

First, whether the evidence supports a jury instruction explaining state law remains a matter of state law, not federal constitutional law. Under Illinois law, "'a person charged as a principal can be convicted upon evidence showing that he was in fact only an aider or abettor.'" *Ashburn v. Korte*, 761 F.3d 741, 758 (7th Cir. 2014) (quoting *People v. Doss*, 426 N.E.2d 324, 327 (Ill. App. Ct. 1981)). Accountability is

not a "separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense" and "an individual is legally accountable for the criminal conduct of another when he deliberately assists in planning or committing the crime." *Id.* (citing 720 ILCS 5/5–2(c)).

Here, the record supported the trial court's decision to instruct the jury on accountability. Santos testified that Rodriguez and Petitioner planned to steal drugs from Avila and shoot him, that both men exited her car to meet Avila, and that Petitioner told her he was the one who actually shot Avila; Petitioner later told Sergeant Wojcik that, although he was present, Rodriguez shot Avila. As a result, the evidence supported an accountability instruction. *Ashburn*, 761 F.3d at 758–59.

To challenge a legally accurate jury instruction, Petitioner must show that the "instruction was ambiguous and there was a reasonable likelihood that the jury applied the instruction in a way that violated the U.S. Constitution." *Burris v. Smith*, 819 F.3d 1037, 1041 (7th Cir. 2016) (citing *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009)). A habeas petitioner carries "an especially heavy burden to show constitutional error from an instruction quoting state law." *Id.* The relevant question is whether the challenged instruction by itself "so infected the entire trial that the resulting conviction violates due process.'" *Id.*

Petitioner argues that the instruction confused the jury, given that Jorge Rodriguez did not testify, and the jury's question showed its confusion about the accountability instruction. *Id.* On the contrary, the jury's question during its deliberation—"if Poe was part of a conspiracy to commit a crime, and the victim died,

is Poe guilty of first degree murder," [24-7] at 118—demonstrated its understanding of the legal principle that, even if it found that Petitioner thought he and Rodriguez were only going to rob Avila, Petitioner could still be guilty of the crime charged. *See People v. Causey*, 793 N.E.2d 169, 178 (Ill. App. Ct. 2003) ("the State is not required to prove that the defendant could foresee the death or that the defendant intended to commit murder; it merely must show that the defendant intended to commit the underlying felony"); *People v. Miller*, 781 N.E.2d 300, 308 (Ill. 2002) (The accountability statute "effectively bars courts from considering the offender's degree of participation in the crime by making all persons who participate in a common criminal design equally responsible."). The jury properly received and understood the instructions on first degree murder and accountability, and the state courts reasonably rejected this claim. This Court does so as well. Claim eight is denied.

## J. Claim Nine: Ineffective Assistance of Trial Counsel

Petitioner next claims that his trial counsel provided constitutionally ineffective assistance in several respects.[3] To demonstrate that his constitutional right to counsel was violated by ineffective assistance, Petitioner must show both: (1) that his counsel's performance was deficient because it fell below an "objective standard" of reasonableness; and (2) "that 'there is a reasonable probability that, but

---

[3] When addressing Petitioner's ineffective assistance of counsel claims, Respondent focuses on Petitioner's attorney's performance overall, as opposed to discussing each asserted ground of deficient performance. [25] at 19–22. This approach works, particularly in a case like this where three witnesses testified Petitioner confessed and counsel did his best to discredit each witness's testimony. *See Carter v. Duncan*, 819 F.3d 931, 950 (7th Cir. 2016) (Easterbrook, concurring) ("*Strickland* directs a court to examine the totality of counsel's performance, not to concentrate on a supposed error while losing sight of what the lawyer *did* for his client.") (emphasis in original). For sake of completeness, however, this Court not only examines the totality of the performance but also specifically addresses each asserted basis of Petitioner's ineffectiveness claim.

for counsel's unprofessional errors, the result of the proceeding could have been different.'" *Campbell v. Reardon*, 780 F.3d 752, 762 (7th Cir. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984)).

With respect to the deficient performance element, courts "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Strickland*, 466 U.S. at 689). Petitioner must show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Additionally, when this Court considers a state court's denial of an ineffective assistance claim under § 2254(d)'s deferential standard of review, a "doubly deferential judicial review" applies. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)); *see also Winfield v. Dorethy*, 871 F.3d 555, 560 (7th Cir. 2017).

As to the prejudice prong, a "reasonable probability" that the result of the proceedings "would have been different" means that the attorney's errors were serious enough "to undermine confidence in an outcome" and to render the proceedings "fundamentally unfair or unreliable." *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013). With these standards in mind, the Court considers the attorney's performance as a whole and discusses the specific grounds of Petitioner's ineffective assistance claims below.

### (a) Failure to Object to Prosecutor's Closing Argument

Petitioner argues that his trial attorney was ineffective for failing to object to the prosecutor's closing comment to the jury to "do something about this violence [in society]" and to send a message with its verdict, as well as the prosecutor's statement that Petitioner shot at "close range." [1] at 12–14; [24-7] at 57–58, 91. As discussed above, however, although prosecutors cannot "incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation," *People v. Johnson*, 803 N.E.2d 405, 420 (Ill. 2003), the prosecutor in this case did not do so. The prosecutor, as the state appellate court determined, made limited comments about violence and "prefaced his limited reference to crime in general by first relying on the evidence." [24-12] at 23. The record supports this determination and the state appellate court's finding that the prosecutor did not misstate facts when he said Avila was shot at close range from outside his car. [24-12] at 23–25. Given that the prosecutor's comments were neither impermissible under Illinois law, nor an inaccurate description of the evidence, this Court rejects Petitioner's ineffective assistance of counsel claim based upon counsel's failure to object to the comments. *See, e.g., Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (attorney performance not deficient for failing to make a futile objection).

### (b) Stipulating Regarding Ballistics

Petitioner claims that his trial attorney was "clearly ineffective" for stipulating to the expert's proposed ballistics testimony and for allowing the gun into evidence,

because such evidence purportedly served no benefit to his case and that his attorney's decision cannot be chalked up to "sound trial strategy." [1] at 108.

At trial, both sides stipulated that, if called to testify, ballistics expert Jon Flaskamp would have testified to the following about the gun and the bullet fragment retrieved from Avila's body:

> People's Exhibit number 11 is a six shot 38 special revolver. He (Flaskamp) test fired the weapon and it was operational. People's Exhibit 38-A, the fired bullet, is a 38-caliber bullet. People's Exhibit number 38-B, a fired bullet fragment, is consistent with a 38-caliber bullet. . . . He could not identify or eliminate People's Exhibit 38-A, the fired bullet, and People's Exhibit 38-B, the fired bullet fragment, as having been fired in the same firearm . . . People's Exhibit number 11. Some of the things that can prevent an identification or elimination from being conclusive are damage[] to the bullet or failure of the firearm to reproduce individual characteristics on to the bullet when the weapon is fired.

[24-7] at 13–14.

> During closing, Petitioner's attorney argued:

> [T]here's three parts to the whole incident. What we know, what we don't know, what we want to be shown. Let's get into the things we'd like to be shown.

> I'd like to be shown a fingerprint; from the trunk, the keys, the window, the side door, the body, the cup in the car. Anything that links my client to this car.

> I'd like to see DNA evidence, a blood splatter, anything that would put my client near that car or having [Avila's] blood on him if he's going to be firing from such close proximity as the State would have you believe. I would really like to see a match of that weapon . . . to the bullet pulled out of Mr. Avila. We don't have that either.

> I'd like to see a kilo of cocaine or the money to be used to purchase it. We don't have that. We don't even have that from Carolina, the driver. Nobody gets back in that car with drugs. Nobody left there with money.

> I also wouldn't mind having explained . . . why it was Eight Ball that moved the body. Why it was Eight Ball that moved the car. Why it was Eight Ball that hatched the plan. Why it was Eight Ball that knew the victim. Why it was Eight Ball that sold the gun. Why it was Eight Ball that didn't return to Caroline's car. And why they would shoot this young man if there weren't drugs there.
>
> Ask yourself the questions. My client didn't know this person. His purpose was to get a kilo of cocaine to sell.

[24-7] at 66–67.

Contrary to Petitioner's contention, stipulating to the ballistics expert's testimony not only minimized the prejudice of having the expert testify on the stand, but it also supported his defense that no physical evidence connected Petitioner to the murder. The question the jury asked during deliberations—"if Poe was part of a conspiracy to commit a crime, and the victim died, is Poe guilty of first degree murder."—shows that the jury had doubts, or at least considered, whether Petitioner shot Avila or even planned to shoot him. [24-7] at 118. Based upon the record, stipulating to proffered testimony about inconclusive test results did not diminish Petitioner's defense about the lack of physical evidence against him. As a result, counsel performance (including the decision to stipulate to the expert) remained effective and Petitioner fails to show prejudice. As such, the state courts properly rejected his ineffective assistance claim, and thus, this rejection was not unreasonable under § 2254(d). *See* 28 U.S.C. § 2254(d).

**(c)    Counsel's Failure to Challenge Petitioner's Arrest**

Petitioner next claims his trial attorney was ineffective for not challenging Petitioner's arrest for lack of probable cause and for not challenging the forced,

warrantless entry into his girlfriend's apartment. [1] at 113–14. According to Petitioner, his attorney should have challenged his arrest and then argued that his incriminating statement given at the police station 43 hours after his arrest was "fruit of the poisonous tree." *Id.* at 113.

To the extent Petitioner argues ineffective assistance for failing to challenge his arrest for a lack of probable cause, the claim lacks merit. Prior to the arrest, Jorge Rodriguez not only confessed to police officers that he and Petitioner shot Avila while intending to steal his cocaine, but he also told officers that Avila was shot once in the head and once in the chest, and then he told officers where they could find the gun allegedly used to shoot Avila. [24-14] at 103–05. All of this occurred before Petitioner's arrest.

Probable cause for an arrest exists when the law enforcement agents could reasonably believe, based upon the totality of the "facts and circumstances" within their collective knowledge at the time of the arrest, that the suspect "had committed or was committing an offense." *United States v. Rosario*, 234 F.3d 347, 350 (7th Cir. 2000). Incriminating statements by a suspect about another suspect's involvement, particularly when information "was corroborated by independent police work," can suffice. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). Here, the police had probable cause to arrest Petitioner.

Petitioner's claim that his attorney should have tried to suppress the incriminating statement because officers entered his girlfriend's apartment without a warrant also lacks merit. The "rule of *Payton v. New York*, 445 U.S. 573 (1980),

which prohibits the warrantless, nonconsensual entry into an individual's home to make an arrest, is 'designed to protect the physical integrity of the home.'" *United States v. Villegas*, 495 F.3d 761, 769 (7th Cir. 2007) (quoting *New York v. Harris*, 495 U.S. 14, 17 (1990)). Even assuming Petitioner could somehow establish the requisite standing to challenge an alleged violation of his girlfriend's privacy (which he has failed to do), the exclusionary rule does not apply to statements "made by a defendant while in custody outside of the home when the police have probable cause to arrest the suspect, even though the arrest itself may violate *Payton*." *Id.* at 769–70 (citing *Harris*, 495 U.S. at 118–19). Petitioner's attorney cannot be considered ineffective for not challenging the incriminating statement based on a purported *Payton* violation. *Perez v. United States*, 286 F. App'x 328, 331 (7th Cir. 2008) ("Failure to raise a losing argument or pursue a losing motion . . . does not constitute ineffective assistance."). The state courts reasonably denied this claim.

### (d)     Failure to Call Witnesses to Bolster Petitioner's Story

Petitioner contends that he never reinitiated conversation with officers on August 6, 2001, that the officers lied when they said he did, and that his statement, made after he requested an attorney, therefore violated *Miranda*. According to Petitioner, officers fabricated that he made the incriminating statement that Rodriguez shot Avila and that Petitioner and Rodriguez intended only to steal Avila's drugs. Petitioner argues that his attorney should have called Detective Janet Howard, who would have testified that Petitioner never knocked on the door of the interrogation room to ask for medicine for his tooth, and Lorena Reynosa, who would

have stated that no one asked her for Petitioner's medication. [1] at 115. Such testimony, Petitioner argues, would have contradicted Sergeant Wojcik's testimony surrounding his statement.

Petitioner's attorney did file a motion to suppress the statement. In it, he argued that Petitioner did not receive a probable cause hearing within 48 hours of his warrantless arrest and, as a result, any statements made prior to such a hearing had to be suppressed; he also argued that Petitioner several times invoked his right for his attorney to be present, and his question to Sergeant Wojcik about why Petitioner was still being confined was insufficient to waive any *Miranda* rights. [24-1] at 31–35. At the time of the attorney's motion to suppress, an Illinois appellate court had decided that, even if the probable cause hearing occurred within 48 hours of an arrest, the "delay may still be unconstitutional if the defendant shows it was unreasonable," and that suppression of statements made during the delay was a proper penalty for the violation. *People v. Willis*, 801 N.E.2d 47, 55–58 (Ill. App. Ct. 2003). Although this holding was reversed in 2005, when the attorney filed his motion in 2004, Illinois courts considered statements made during a *Gerstein* delay excludable. *People v. Willis*, 831 N.E.2d 531 (Ill. 2005).

Likewise, whether Petitioner reinitiated when he asked Sergeant Wojcik about why he was still being held (and thus waived right to counsel), the Illinois Supreme Court held in 1995 that an accused's question "What happened?" after a line-up remained insufficient to establish that he reinitiated conversation and "knowingly

and intelligently waived" his previously invoked rights to counsel and/or silence. *People v. Olivera*, 647 N.E.2d 926, 930 (Ill. 1995).

Based upon the facts (and the controlling law at the time), defense counsel provided effective assistance. First, in challenging the specific types of evidence used in support of the suppression motion, Petitioner's claim invites the type of "Monday morning quarterbacking" this Court must resist when addressing ineffective assistance claims. *E.g., Brown v. Sternes*, 304 F.3d 677, 691–92 (7th Cir. 2002); *see also Blake*, 723 F.3d at 879 ("Courts are admonished not to become 'Monday morning quarterback[s]' in evaluating counsel's performance.") (quoting *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)). Second, based upon the parties' stipulation at the hearing, if called to testify, Howard would have actually hurt the Petitioner's theory by stating that Petitioner "knocked on the door of the interview room" when "he needed medication for his tooth." [24-5] at 203. Petitioner does not explain why he thinks Howard would have testified differently on the stand, or why, given the stipulation, his attorney was somehow ineffective for not calling her to testify live.

### (e)    Counsel's Failure to Object to the Introduction of Evelyn Rodriguez's Grand Jury Testimony

Petitioner next claims that counsel failed to object to the admission of Evelyn Rodriguez's grand jury testimony as a prior inconsistent statement. [1] at 116. As

previously discussed, however, Evelyn's prior testimony was, in fact, admissible under both state and federal law.[4]

Here, Evelyn's trial testimony—that she remembered nothing about Petitioner's actions in July of 2001—remained inconsistent with her grand jury testimony, where she described not only his actions but also his admission that he shot Avila. [24-6] at 45–74. As such, and as § 5/115-10.1 indicates should be done, Petitioner's trial attorney cross-examined Evelyn about her grand jury testimony. On cross, defense counsel got her to admit that she was just 15 or 16 when she testified before the grand jury; that her parents were not allowed to go with her when she appeared; that no attorney was called for her; that she was locked in a room at the police station for an entire day before testifying; that officers told her what they believed happened before she testified; that she allegedly repeated what the officers told her; that officers threatened that she would be charged with an offense if she did not cooperate; and that she testified before the grand jury only because she was scared. *Id.* at 74–84. During closing arguments, Petitioner's attorney argued this evidence to the jury, and asked them to credit her trial testimony over her grand jury testimony. [24-7] at 69–70. In short, Petitioner's attorney did all that could be done with Evelyn's incriminating grand jury testimony.

As determined by the state appellate court on direct appeal, the trial court properly admitted the testimony. [24-12] at 31–33; *see also Samuel*, 525 F.3d at 568–

---

[4] Like the Federal Rules of Evidence, 725 ILCS 5/115-10.1 states that "a prior statement is admissible if (1) it is inconsistent with the witness's trial testimony, (2) the witness is subject to cross-examination about the statement at trial, and (3) the statement was given under oath at a prior hearing."

69.  Here, Petitioner fails to establish any defect in defense counsel's decision not to make a losing objection, or in his approach for challenging the reliability of Evelyn's grand jury testimony.  This Court finds that the state courts reasonably denied the ineffective assistance of counsel claim on this basis.

### (f)    Counsel's Failure to Object Regarding the Jury's Question

Petitioner next argues ineffective assistance for trial counsel's failure to object to the trial court's response to the jurors' accountability question.  As explained above, during deliberations, the jury sent a note to the trial judge stating:

> We think we understand the law that was stated to us, but please make it clearer to us that if Poe was part of the conspiracy to commit a crime, and the victim died, is Poe guilty of first-degree murder.

[24-7] at 118.  After receiving the note, the trial judge convened the parties, discussed the issue, and then, with the approval of both attorneys, responded to the jury stating, "please closely reread the instruction beginning 'to sustain the charge of first-degree murder' and determine if that answers your question."  *Id.* at 118–20.  The referenced instruction read:

> To sustain the charge of first-degree murder, it is not necessary for the State to show that it was or may have been the original intent of the Defendant or one for whose conduct he is legally responsible to kill the deceased, Mario Avila.
>
> It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the Defendant or one for whose conduct he is legally responsible combined to do an unlawful act, such as commit armed robbery, and that the deceased was killed by one of the parties committing that unlawful act.

[24-7] at 107–08.

As previously discussed, the trial evidence supported the jury instruction, and the trial judge's response to the jury simply directed it back to the court's instructions (which were correct statements of the applicable law). Petitioner fails to show any error in the judge's response. As such, the state courts' denial of his claim was not unreasonable.

**(g)     Counsel's Failure to Move to Quash the Indictment**

Petitioner claims that his trial counsel "failed to file a motion to quash indictment w[h]ere he was held more than 30 days without indictment or a preliminary hearing." [1] at 116. On post-conviction review, the state trial court determined that "defendant was indicted within a 30-day period," [24-15] at 40, relying in part on the electronic case docket showing that Petitioner was arrested August 6, 2001 and indicted September 4, 2001, [24-14] at 202. Thus, the record supports the trial court's finding of a timely indictment under state law which is entitled to a presumption of correctness–a presumption Petitioner has not rebutted.

**(h)     Counsel's Failure to Inform Petitioner of the 15-year Minimum Sentence for Using a Firearm**

Next, Petitioner claims ineffective assistance because his trial attorney supposedly "failed to inform Petitioner of the 15 year enhancement" when advising him about the plea offers. [1] at 116. The trial court, however, held an evidentiary hearing on this claim, heard testimony from both Petitioner and his former defense attorney, and determined that counsel "informed the defendant of the range of sentences that could be imposed in this case, and specifically what the correct minimum sentence would be if convicted as charged." [24-7] at 165–66. Defense

43

counsel testified at the hearing that he told Petitioner that the minimum sentence for his case (murder with a firearm) was 35 years, which included the 15-year enhancement. *Id.* at 104, 114. Such testimony supports the trial judge's finding, and the Court presumes the correctness of that finding. *See* 28 U.S.C. § 2254(e). Petitioner has offered nothing to rebut that presumption.

Having determined that none of Petitioner's ineffective assistance of trial counsel claims has merit, the Court denies claim nine.

## K. Claim Ten: Ineffective Assistance of Appellate Counsel

Finally, Petitioner claims ineffective assistance of his appellate attorney because counsel (a) failed to challenge the trial court's refusal to suppress Petitioner's incriminating statement; and (b) failed to argue the insufficiency of the evidence supporting the conviction. [1] at 118, 124–28. Here, Petitioner asserts the same arguments asserted in claims 7 and 9(d) above: (1) the incriminating statement constituted fruit of the illegal arrest, which should have been suppressed; and (2) his conviction was based not on any physical evidence, but solely on the testimony of unreliable witnesses. *Id.*

*Strickland* applies to ineffective assistance claims regarding appellate counsel, just as it governs claims concerning trial counsel. Thus, Petitioner cannot succeed on this claim unless he establishes a constitutionally deficient performance of appellate counsel which, in fact, prejudiced the outcome of the appeal. *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). Appellate counsel is "not required to present every non-frivolous claim on behalf of her client," and the performance becomes deficient only if

counsel "fails to argue an issue that is both 'obvious' and 'clearly stronger'" than the issues actually raised. *Id.* at 897–98.

As discussed above, neither issue Petitioner contends should have been raised on direct appeal had merit. Police possessed probable cause to arrest Petitioner based upon Rodriguez's confession to police that he and Petitioner planned to steal Avila's drugs and kill him. [24-14] at 101–08. A challenge to the arrest for lack of probable cause would have been just as futile for appellate counsel as it was for trial counsel. *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013) (attorneys need not assert meritless claims). Likewise, any argument on appeal that the officers entered Lorena Reynosa's residence without a warrant (and struck Petitioner in the head) would have lacked merit and failed to result in the suppression of the statement. *Villegas*, 495 F.3d at 769. Petitioner's warrantless arrest did not affect the constitutionality of his incriminating statement; nor did the rap to his head (administered to wake him). Petitioner fails to even allege how the blow coerced him or in any way affected his decision to speak. Nor does the record support such a contention. Appellate counsel's failure to challenge Petitioner's arrest, or its effect on his incriminating statement, constituted neither deficient performance nor prejudice. *See Makiel*, 782 F.3d at 897–98; *Warren*, 712 F.3d at 1104.

The same is true for any failure to challenge the verdict for insufficient evidence. Just as this argument fails to show ineffective assistance of trial counsel, it fails to show any constitutional defect in appellate counsel's performance. Indeed,

as discussed in connection with claim 7, even if counsel had argued the point, it would not have affected the outcome of Petitioner's appeal. The Court denies claim ten.

## L.    Certificate of Appealability

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The denial of Petitioner's habeas petition is a final decision ending this case. If he seeks to appeal, he must file a notice of appeal in this Court within 30 days judgment is entered. Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this decision to preserve his appellate rights, but if he wishes this Court to reconsider its judgment, he may file a motion under Fed. R. Civ. P. 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of entry of judgment and suspends the deadline for filing an appeal until the motion is ruled on. *See* Fed. R. Civ. P. 59(e) and Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled on only if the motion is filed within 28 days of the judgment. Fed. R. App. P. 4(a)(4)(A)(vi). The time to file a Rule 59(e) or 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

## CONCLUSION

For the above stated reasons, the Court denies Petitioner's § 2254 petition and dismisses this case. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is directed to: (1) replace Randy Pfister with Petitioner's current custodian, Menard Correctional Center Warden Frank Lawrence, as Respondent; (2) alter the case caption to *Sangathit v. Lawrence*; and (3) enter judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

Dated: March 30, 2020                          Entered:

                                               John Robert Blakey
                                               United States District Judge